[1 NE3d 782, 978 NYS2d 708]

In the Matter of the Estate of RIVEN FLAMENBAUM, Deceased. VORDERASIATISCHES MUSEUM et al., Respondents; HANNAH K. FLAMENBAUM, as Executor of RIVEN FLAMENBAUM, Deceased, Appellant.

Argued October 15, 2013; decided November 14, 2013

APPEARANCES OF COUNSEL

*Jaspan Schlesinger LLP*, Garden City (*Steven R. Schlesinger* and *Seth A. Presser* of counsel), for appellant.

*Dunnington, Bartholow & Miller LLP*, New York City (*Raymond J. Dowd, Luke A. McGrath* and *Robert F. Dannhauser* of counsel), and *Hamburger, Weinschenk & Fisher* (*John C. Fisher* of counsel) for Vorderasiatisches Museum, respondent.

*Andrews Kurth, LLP*, New York City (*Joseph A. Patella* of counsel) and *Andrews Kurth, LLP*, Washington, D.C. (*Thomas R. Kline* of counsel), and *Law Offices of Lucille A. Roussin* (*Lucille A. Roussin* of counsel) for Archaeological Institute of America and others, amici curiae.

## OPINION OF THE COURT

MEMORANDUM.

The order of the Appellate Division should be affirmed, with costs, and the certified question should be answered in the affirmative.

In this probate proceeding, the Vorderasiatisches Museum in Berlin, Germany (the Museum), seeks to recover a 3,000-year-old gold tablet from the estate of Riven Flamenbaum (the Estate). The tablet was first discovered prior to World War I by a team of German archeologists excavating at the foundation of the Ishtar temple in Ashur, Iraq. The tablet dates back to the reign of Assyrian King Tukulti-Ninurta I (1243-1207 BCE) and bears an inscription written in Assyro-Babylonian language and

Middle-Assyrian cuneiform script. The tablet was shipped to the Berlin Museum (now the Vorderasiatisches Museum) in 1926. The Museum's inventory book catalogs the arrival of the gold tablet and provides a description and a sketch. In 1939, the Museum was closed because of World War II, and objects from Ashur were put in storage. In 1945, at the end of the war, the gold tablet was missing.

The tablet resurfaced in 2003, when it was discovered among the possessions of the decedent, a resident of Nassau County and a Holocaust survivor. When Hannah K. Flamenbaum, the decedent's daughter and executor of the Estate, petitioned to judicially settle the final account, she listed a "coin collection" as an asset of the Estate. Israel Flamenbaum, the decedent's son and Hannah's brother, filed objections to the accounting, wherein he claimed that the value of the coin collection was understated "and includes one item identified as a 'gold wafer' which is believed to be an ancient Assyrian amulet and the property of a museum in Germany." Israel also notified the Museum about the tablet, and the Museum responded that the gold tablet is part of its Assyrian collection and had been missing since the end of World War II.

The Museum thereafter filed a notice of appearance and claim with the Surrogate's Court, Nassau County, to recover the tablet. The Surrogate held a hearing, at which the Museum's director, Dr. Beate Salje, was the sole witness to testify. Dr. Salje testified that the tablet, along with many other objects, disappeared from the Museum sometime near the end of World War II. Russian troops removed some objects at the end of the war, brought them to Russia, and then back to the Museum in 1957. Dr. Salje stated that she did not know if the tablet was taken by Russian troops, German troops, or people who came to the Museum to take refuge.

The Museum also submitted the report of Dr. Eckart Frahm, Assistant Professor of Assyriology at Yale University. As explained by Dr. Frahm, a 1983 article written by A.K. Grayson, entitled *Antiquities from Ashur: A Brief Description of Their Fate with Special Reference to the Royal Inscription*, published in the Annual Review of the Royal Inscriptions of Mesopotamia Project, stated that "Professor H.G. Güterbock [a professor at the Oriental Institute of the University of Chicago] in a private communication told [Grayson] of having seen a gold tablet . . . which was in the Berlin Museum before the war . . . in the hands of a dealer in New York in 1954." There is an entry in

the Museum's record that reads "[s]een by Güterbach 1954 in New York," and underneath it says "Grayson." This entry is undated, and nothing in the record indicates when the Museum first learned that the tablet was reportedly sighted in 1954.

After the hearing, Surrogate's Court determined that, although the Museum met its prima facie burden of proving legal title or superior right of possession to the tablet, its claim was barred by the doctrine of laches because the Museum had failed to either report the tablet's disappearance to the authorities or list the tablet on any international stolen art registries. This inaction, according to the court, prejudiced the Estate's ability to defend against the Museum's claim to the tablet.

The Appellate Division, among other things and as relevant here, reversed the Surrogate's Court order on the law, granted the Museum's claim for the return of the tablet, and remitted the matter to Surrogate's Court for further proceedings (*see Matter of Flamenbaum*, 95 AD3d 1318 [2d Dept 2012]). The Appellate Division concluded that the Estate had not established that the Museum failed to exercise reasonable diligence to locate the tablet, or that the Museum's inaction had prejudiced the Estate. That court granted the Estate's motion for leave to appeal pursuant to CPLR 5602 (b) (1) and certified the following question: "Was the decision and order of this Court dated May 30, 2012, properly made?" We now affirm and answer the certified question in the affirmative.

We agree with the Appellate Division that the Estate failed to establish the affirmative defense of laches, which requires a showing "that the museum failed to exercise reasonable diligence to locate the tablet and that such failure prejudiced the [E]state" (95 AD3d at 1320, citing *Solomon R. Guggenheim Found. v Lubell*, 77 NY2d 311, 321 [1991]; *see also Sotheby's, Inc. v Shene*, 2009 WL 762697, 2009 US Dist LEXIS 23596 [SD NY, Mar. 23, 2009, Griesa, J., No. 04-Civ-10067 (TPG)]). While the Museum could have taken steps to locate the tablet, such as reporting it to the authorities or listing it on a stolen art registry, the Museum explained that it did not do so for many other missing items, as it would have been difficult to report each individual object that was missing after the war. Furthermore, the Estate provided no proof to support its claim that, had the Museum taken such steps, the Museum would have discovered, prior to the decedent's death, that he was in possession of the tablet (*compare Matter of Peters v Sotheby's Inc.*, 34 AD3d 29, 37-38 [1st Dept 2006], *lv denied* 8 NY3d 809 [2007] [laches

barred claim where owner had actual knowledge of the identity of the party in possession but did not demand return of the property]). As we observed in *Lubell*, in a related discussion of the defense of statute of limitations, "[t]o place the burden of locating stolen artwork on the true owner and to foreclose the rights of that owner to recover its property if the burden is not met would . . . encourage illicit trafficking in stolen art" (77 NY2d at 320).

Additionally, the Estate failed to demonstrate "the essential element of laches, namely prejudice" (*Matter of Barabash*, 31 NY2d 76, 82 [1972]). While the Estate argued that it had suffered prejudice due to the Museum's inaction, there is evidence that at least one family member (decedent's son) was aware that the tablet belonged to the Museum. And, although the decedent's testimony may have shed light on how he came into possession of the tablet, we can perceive of no scenario whereby the decedent could have shown that he held title to this antiquity.

▪ The "spoils of war" theory proffered by the Estate—that the Russian government, when it invaded Germany, gained title to the Museum's property as a spoil of war, and then transferred that title to the decedent—is rejected. The Estate's theory rests entirely on conjecture, as the record is bereft of any proof that the Russian government ever had possession of the tablet. Even if there were such proof, we decline to adopt any doctrine that would establish good title based upon the looting and removal of cultural objects during wartime by a conquering military force (*see Menzel v List*, 49 Misc 2d 300, 305-308 [Sup Ct, NY County 1966], *mod as to damages* 28 AD2d 516 [1st Dept 1967], *revd as to modification* 24 NY2d 91 [1969]).* Allowing the Estate to retain the tablet based on a spoils of war doctrine would be fundamentally unjust.

---

* Notably, it was the official policy of the United States during World War II to forbid pillaging of cultural artifacts. The Rules of Land Warfare of the United States War Department provided that "[a]ll movable property belonging to the State directly susceptible of military use may be taken possession of as booty and utilized for the benefit of the invader's government. Other movable property, not directly susceptible of military use, must be respected and cannot be appropriated" (Rules of Land Warfare rule 321, War Department of the United States, Basic Field Manual [FM 27-10 1940] at 82, quoted in *Menzel*, 49 Misc 2d at 306 n 1).

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT, RIVERA and ABDUS-SALAAM concur.

Order affirmed, with costs, and certified question answered in the affirmative, in a memorandum.