Reif v Nagy (2019 NY Slip Op 05504)





Reif v Nagy


2019 NY Slip Op 05504


Decided on July 9, 2019


Appellate Division, First Department


Singh, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 9, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr.,J.P.
Rosalyn H. Richter
Peter Tom
Cynthia S. Kern
Anil C. Singh,JJ.


161799/15 8172 

[*1]Timothy Reif, et al., Plaintiffs-Respondents,
v
Richard Nagy, et al., Defendants-Appellants.



Defendants appeal from an order of the Supreme Court, New York
County (Charles E. Ramos, J.), entered on or about June 11, 2018, which, inter alia, granted plaintiffs' motion for summary judgment on their claims of replevin and conversion directing defendants to return the Artworks to plaintiffs, and for an award of damages, costs, and attorneys' fees.




Nixon Peabody LLP, New York (Thaddeus J. Stauber and Kristin M. Jamberdino of counsel), for appellants.
Dunnington Bartholow & Miller LLP, New York (Raymond J. Dowd and Samuel A. Blaustein of counsel), for respondents.



SINGH, J.


This controversy stems from art allegedly looted by the Nazis during World War II. We are asked to decide whether Supreme Court properly granted plaintiffs, Timothy Reif and David Frankel, as co-executors of the estates of Leon Fischer and Milos Vavra (collectively plaintiffs), summary judgment on their claims for conversion and replevin. We find that plaintiffs made a prima facie showing of entitlement to judgment as a matter of law that they have superior title to two pieces of art by Egon Schiele, "Woman Hiding Her Face (1912)" and "Woman in a Black Pinafore (1911)" (collectively the Artworks), and that defendants Richard Nagy and Richard Nagy Ltd. (collectively defendants) failed to raise a triable issue of material fact.
Background
Plaintiffs are the legally declared heirs of Fritz Grunbaum (Grunbaum), a well-known [*2]Jewish Viennese cabaret artist and art collector [FN1]. Grunbaum admired the Viennese modern artist, Egon Schiele, and amassed an 81-piece collection of his work before World War II. After the Nazi invasion of Austria on March 12, 1938, Grunbaum attempted to escape with his wife, Elisabeth "Lilly" (nee Herzl) Grunbaum (Elisabeth), to Czechoslovakia, but was apprehended and arrested by the Nazis on or about March 22, 1938. From the time of his arrest until his murder on or about January 14, 1941, Grunbaum remained imprisoned in various concentration camps, including Buchenwald and Dachau.
Throughout Grunbaum's imprisonment Elisabeth endeavored to secure his release so that they could flee to family abroad. Her sister, Mathilde Lukacs (Mathilde), and brother-in-law, Sigmund Lukacs (Sigmund) (collectively the Lukacses) had fled Vienna to escape Nazi persecution of the Jews. Sigmund had been arrested at the same time as Grunbaum but was released two months later on condition that he would leave Austria. He and Mathilde escaped to Belgium on August 26, 1938, where they resided until 1941 when they fled to Brussels. Elisabeth remained in Austria hoping Grunbaum would be released, as promised by certain German officers. However, starting on Kristallnacht [FN2] and continuing throughout the war, the Nazis passed a series of laws targeting the Viennese Jewish community, directly impeding Elisabeth's efforts to secure Grunbaum's release as well her own ability to flee Nazi persecution.
On July 16, 1938, while Grunbaum was imprisoned at Dachau, the Nazis forced him to execute a power of attorney in favor of Elisabeth. Just four days later, pursuant to the purported power of attorney, Elisabeth was compelled to permit a Nazi official named Franz Kieslinger (Kieslinger) to inventory Grunbaum's property, including his art collection, which contained the 81 pieces by Schiele. Kieslinger determined Grunbaum's entire art collection of over 400 pieces to be valued at 5,791 Reichsmarks (RM)[FN3]. Kieslinger inventoried the Schiele pieces as follows: [*3]he first listed the five oils by name, then he listed together 55 sheets of "large hand drawings," 20 pencil drawings, and one etching, but gave no more details, nor their titles. Grunbaum's collection also included French watercolors and pieces by artists such as Rembrandt, Degas, Rodin and Durer, all identified by name in the Kieslinger inventory. Only Grunbaum's name appears on the inventory. Elisabeth had her own property and filed a separate declaration on behalf of herself on or about April 27, 1938.
Sometime after it was inventoried, Grunbaum's entire art collection was deposited with Schenker & Co., A.G. (Schenker), a Nazi-controlled shipping company,[FN4] and marked for "export." On September 8, 1938, the company formally applied for an export license for "Lilly Grunbaum." The license, however, is devoid of customs stamps, meaning that the art collection never legally left Austria [FN5]. In addition, a subsequently filed statement of assets dated November 12, 1938, lists Grunbaum, "formerly Vienna . . . now Buchenwalde," as still possessing 5,791 RM worth of "pictures and graphics."
Prior to fleeing Austria, the Lukacses' were also forced to inventory their assets. In her property registration dated July 15, 1938, Mathilde reported a total of 22 pictures, without further detail, which were valued at 400 RM. This inventory corresponded with the Lukacses' "moving notice," which Mathilde had filed in the name of Sigmund on June 23, 1938. The notice stated that the Lukacses had, among other things, "23 various framed pictures, 1 photo frame, 16 small photo's [sic] and etchings framed." Schenker filed an export request on behalf of Sigmund on June 27, 1938, which listed for export "eleven oil paintings, three watercolors, eight graphics, five miniatures, three drawings, 20 pieces of miscellaneous porcelain and ten carpets." The items left Vienna on or about August 12, 1938, about the same time the Lukacses fled. The Grunbaum art collection, including the 81 works by Schiele, was not listed as part of any of the Lukacses' emigration documents.[FN6]
On or about January 31, 1939, attorney Ludwig Rochlitzer (Rochlitzer) was appointed as [*4]the Grunbaums' Aryan Trustee [FN7]. That same day, Rochlitzer sent Elisabeth a bill for 6,500 RM for services. It appears that Elisabeth paid Rochlitzer's bill, but it is unclear from whose assets she paid it.
By early 1939, under Nazi orders, Elisabeth was evicted from her apartment. She went to live with a non-Jewish woman, Grete Hassel (Hassel). After going into hiding, Elisabeth was captured by the Nazis and sent to live in the "collective Jewish residences," a euphemism for "ghetto."[FN8] In the ghetto, she was forced to live in overcrowded and squalid conditions, deprived of nearly all valuables.
While in the ghetto, Elisabeth filed an updated property declaration on behalf of Grunbaum on or about June 30, 1939. That declaration listed Grunbaum's assets as now depreciated by the Reich Flight Tax which was 17,250 RM and the Jewish Property Levy of 8,800 RM, as well as some smaller bills, but, notably, it did not include any depreciation for Rochlitzer's bill. However, it still listed the entire art collection as valued at 5,791 RM. Accordingly, Grunbaum's art collection remained in Austria after Mathilde fled.
On September 3, 1939, World War II broke out, making any subsequent Jewish emigration nearly impossible and highly dangerous.
Grunbaum was murdered at Dachau on June 9, 1941. Elisabeth signed a declaration before an Austrian notary in connection with obtaining her husband's death certificate, stating, "[T]here is nothing left," in other words, there is no estate. Therefore, "[b]ecause of a lack of goods or property, there [was no] estate proceeding for inheritance" before the Dachau Probate Court. On or about October 5, 1942, Elisabeth was murdered at Maly Trostinec death camp.
Grunbaum was survived by Elisabeth and two siblings, one of whom was Elise Zozuli (Zozuli). Zozuli was the only heir who survived World War II. Zozuli is directly related to Milos Vavra,[FN9] a plaintiff in this action.
Postwar Restitution Claims
On May 15, 1947, Sigmund filed two claims to reclaim his property. He had been forced by the Nazis to close his business, they had confiscated his inventory of jewels and they made [*5]him pay a number of export taxes so that he and his wife could flee Austria. In those claims, Sigmund also noted that Mathilde and he had been imprisoned in Brussels by the Nazis on October 26, 1943 and were detained in a senior citizens' home until the end of the war.
On June 16, 1954, Mathilde formerly applied to an Austrian court to declare Elisabeth to be dead and certify her heirship, but she withdrew the application on July 16, 1954.
Additionally, in 1959, Mathilde made a claim for restitution on behalf of her sister Elisabeth. Her claim was for Elisabeth's bank assets and jewelry, including a large pearl necklace, a diamond and platinum brooch, and a large diamond ring. She rescinded the applications when the German government requested a certificate of her right to inheritance.
Between 1945 and 2002, other potential heirs to Grunbaum attempted to lay claim to the Grunbaums' lost assets. None were successful.
On April 19, 1999, Vavra, a great-nephew of Grunbaum, filed a claim for restitution for Grunbaum's works of art in Austria [FN10]. On September 12, 2002, Leon Fischer (Fischer), second cousin of Elisabeth, and Vavra were declared by an Austrian court to be the legal heirs of Grunbaum. Fischer and Vavra (the heirs) passed away, and plaintiffs Reif and Frankel are the current co-executors of their estates.
Grunbaum's Schiele Art Collection
The Kieslinger inventory dated April 27, 1938 listed that Grunbaum had 81 pieces by Schiele. Grunbaum's ownership of the Schieles can be traced back to 1928, when he loaned 21 of the pieces (the two subject paintings not included) to his friend, the Viennese art dealer Otto Nirenstein (later known as, and hereinafter referred to as, Otto Kallir), who exhibited them as part of a retrospective celebrating Schiele's work. There is a detailed list of all 21 pieces from the Grunbaum collection in the exhibition. However, the 1928 catalog compiled by Otto Kallir features only four of the pieces, explicitly attributing them to Grunbaum, but fails to mention the rest of the loaned pieces.
In 1930, Otto Kallir compiled the first catalogue raisonné [FN11] of Schiele's work (the 1930 catalog). Three [FN12] pieces in the catalog are designated as belonging to Grunbaum, none of which are the pieces at issue.
During the subsequent prewar and war years, there was no mention of the Schieles at issue or the entire Grunbaum art collection, aside from the Kieslinger inventory and the Schenker documents.
In 1956, 65 pieces by Schiele surfaced at Gutekunst & Klipstein (later known as and hereafter referred to as Galerie Kornfeld), an art gallery in Switzerland in which Eberhard Kornfeld (Kornfeld) was a principal. The artworks were put on sale by Kornfeld on September 8, 1956, almost immediately after the window for claims made in Austria for Nazi looted art closed, on July 31, 1956. That same year, Galerie Kornfeld issued a sales catalog for its Schiele collection (1956 catalog), which included the artworks at issue here, listed under the titles "Woman, Sitting with Hands on Hips" and "Model, Hiding Face." The catalog also listed "Dead [*6]City III" with a provenance of being previously owned by Grunbaum. However, aside from "Dead City III," no provenance is given for the other Schiele pieces [FN13]. Mathilde's name does not appear as provenance for any of the pieces listed in the 1956 catalog.
Otto Kallir purchased the Schiele collection listed in the 1956 catalog as well as a few others, totaling 110 pieces, from Galerie Kornfeld before 1957. In Otto Kallir's 1966 update of his 1930 catalog, Grunbaum is still the only name listed as the provenance for the same Schiele artworks he had featured. Notably, while Kornfeld's gallery is listed in its provenance as well, Mathilde's name is nowhere to be found.
In 1988, Jane Kallir, the granddaughter of Otto Kallir, published "Egon Schiele: The Complete Works," which included "Woman in a Black Pinafore" (1911) and "Woman Hiding Her Face" (1912), the current titles of the artworks at issue here. She also listed the artworks without full provenance, stating only that they were part of a "private collection." In the Bakalar action, discussed infra, Jane Kallir testified that the Schieles were of Grunbaum provenance. However, in her 1988 catalog and its subsequent updates, there is no mention of either Grunbaum or Mathilde.
The 1998 Seizure of "Dead City III"
In 1998, "Dead City III" was being exhibited at the Museum of Modern Art (MOMA), on loan by the Leopold Foundation,[FN14] a collection amassed after World War II by Dr. Rudolph Leopold and later sold to the Austrian government. Before the painting could be removed from New York, then-District Attorney Robert Morgenthau seized "Dead City III" on the grounds that the Nazis had stolen it from Grunbaum (see Matter of Grand Jury Subpoena Duces Tecum Served on Museum of Modern Art, 93 NY2d 729, 732 [1999]). MOMA contested the seizure citing to section 12.03 of New York's Arts and Cultural Affairs Law, which exempts works of fine art from seizure while on exhibition in a museum. MOMA argued that it was compelled to return the painting to the Leopold Foundation (see Museum of Modern Art, 93 NY2d at 733-734).
The Court of Appeals quashed the subpoena on the grounds that it was contrary to the legislative intent of the statute to permit such seizures. It noted that the legislative intent was "to insulate nonresident lenders from seizures via legal process and, concomitantly, to protect State cultural institutions that depend upon the free flow of art for the benefit of the people of the State of New York" (id. at 736). As a result, "Dead City III" was returned to the Leopold Foundation.
The 2005 Federal Action Regarding "Seated Woman With Bent Left Leg" (1917)
In 2005, David Bakalar brought suit against the Grunbaum heirs, finally declared to be Fischer and Vavra, seeking, inter alia, a declaration that he was the rightful owner of the Schiele drawing "Seated Woman With Bent Left Leg" (1917), a piece he had owned for over 40 years (see Bakalar v Vavra, 819 F Supp 2d 293 [SD NY 2011], affd 500 Fed Appx 6 [2d Cir 2012], cert denied 569 US 968 [2013]).
Bakalar testified that he had purchased the drawing in 1963 from Otto Kallir's Galerie St. Etienne, which had purchased it from Galerie Kornfeld. He maintained that he was not informed of its provenance and he had never heard of either Grunbaum or Kornfeld (Bakalar, 819 F Supp 2d at 295). Kornfeld testified in his deposition in the Bakalar action that he had corresponded with Dr. Leopold in 1998 and told him that he acquired "Dead City III," as well as the rest of the Schiele collection featured in the 1956 catalog, from Mathilde, who died in 1979. This is the first time Kornfeld stated that he purchased the Schiele collection in his 1956 catalog from Mathilde.
Following a bench trial, the District Court made a number of factual determinations, including that Grunbaum had possessed the drawing prior to World War II (Bakalar, 819 F Supp 2d at 295). It also found that Kornfeld had purchased the drawing from Mathilde in 1956 and that Bakalar had purchased the drawing in good faith in 1964 (id.). The court explained that the heirs had failed to produce "any concrete evidence that the Nazis looted the drawing or that it was otherwise taken from Grunbaum" and that the "most reasonable inference . . . is that the [d]rawing remained in the Grunbaum family's possession" throughout World War II (id. at 297, 298-299 [internal quotation marks omitted]).
However, the District Court found that, "Bakalar c[ould] not establish by a preponderance of the evidence that Grunbaum voluntarily relinquished possession of the [d]rawing, or that he did so intending to pass title" (id. at 300). The court also found that Mathilde had not acquired valid title to the drawing (id. at 302-303). Nonetheless, the District Court awarded the drawing to Bakalar on the ground of laches (id. at 305-306).
The Second Circuit affirmed in a summary order,[FN15] observing that the District Court's finding that the drawing had not been looted by the Nazis was not "clearly erroneous" (Bakalar, 500 Fed Appx at 8). However, the Court explicitly declined to rule on whether Mathilde had acquired proper title to the drawing. Instead, it affirmed the District Court's finding that laches applied (id. at 9).
This Action to Recover the Artworks: "Woman Hiding Her Face" (1912) and "Woman in a Black Pinafore" (1911)
By complaint dated March 18, 2016, plaintiffs filed suit against defendants claiming a right of replevin and conversion and a violation of New York General Business Law § 349 and seeking a declaratory judgment that they have ownership of the Artworks. The complaint annexed various documents concerning the Grunbaums, including the Kieslinger inventory, the power of attorney and the property declarations of Grunbaum and Elisabeth.
Also annexed to the complaint is an email from plaintiffs' counsel to defendants, dated November 13, 2015, advising defendants that plaintiffs had learned that day that defendants were offering two Schiele pieces with acknowledged Grunbaum provenance for sale. The Artworks were the pieces at issue here, "Woman in a Black Pinafore" (1911), listed as number 21 in the [*7]1956 catalog, and "Woman Hiding Her Face" (1912), listed as number 22 in the 1956 catalog. Additionally, plaintiffs annexed a letter dated October 6, 2004, from the Art Loss Register,[FN16] stating that "Girl [sic] in a [Black] Pinafore" was not in their database, but that it was definitely a Schiele from the Grunbaum collection and in light of the "Dead City III" litigation, there was a "remote" "chance of a title claim" against the work.
Defendant Richard Nagy, who has been an independent art dealer since 1980, first obtained a 50% share in "Woman in a Black Pinafore" from Thomas Gibson Fine Art on or around February 24, 2005, the day after its unsuccessful auction at Sotheby's [FN17]. In October 2011, he "voided" his interest, given the ambiguity and problems with the provenance. However, he reacquired his interest in the piece on or around December 9, 2013, soon after the Second Circuit affirmed the dismissal of the plaintiffs' claims in Bakalar (see Bakalar, 500 Fed Appx at 6).
Nagy acquired "Woman Hiding Her Face" on December 18, 2013. The Art Sale and Transfer Agreement (the Agreement) for "Woman Hiding Her Face" states that "the heirs of Fritz Grunbaum claim ownership of the Painting on the theory that it was stolen from Mr. Grunbaum when he was deported to a German concentration camp during World War II." Nagy agreed that he would have no claim against the seller if title were declared invalid on that basis. The Agreement listed the provenance of the work, as per Sotheby's, as follows:
"Fritz Grunbaum, Vienna (until 1941);
"Elisabeth Grunbaum-Herzl (widow of the above until 1942);
"Mathilde Lukacs-Herzl (sister of the above);
"Gutekunst & Klipstein Bern, selling exhibition 1956, No. 22 (purchased from above);"
and six subsequent purchasers, the last of whom Nagy acquired it from.
Additionally, pursuant to the terms of the Agreement, on January 16, 2014, Nagy purchased title insurance for "Woman Hiding Her Face," which acknowledged that the piece was registered as "Lost Art" and that claims had been made by Grunbaum's heirs that it was looted by the Nazis during World War II.
Defendants moved to dismiss the action pursuant to CPLR 3211, arguing, inter alia, that Bakalar collaterally estopped plaintiffs from pursuing their claims. Supreme Court, New York County (Charles E. Ramos, J.), denied the motion. On appeal, we modified by dismissing plaintiffs' General Business Law § 349 claim, and otherwise affirmed (149 AD3d 532 [1st Dept 2017]). We explained:
"Collateral estoppel requires the issue to be identical to that determined in the prior proceeding, and requires that the litigant had a full and fair opportunity to litigate the issue. Neither of those requirements has been shown here where the purchaser, the pieces, and the time over which the pieces were held differ significantly. The three works are not part of a collection unified in legal interest such to impute the status of one to another"
(id. at 533 [internal citations omitted]).
Thereafter, plaintiffs moved for summary judgment on their claims for replevin and [*8]conversion, supported by an expert report by Jonathan Petropoulos [FN18] and an expert opinion of Kathrin Hofer.[FN19]
Nagy cross-moved for summary judgment, arguing that there was a lack of evidence that Grunbaum ever owned the Artworks, and, rather, that the evidence showed that the Artworks were always possessed by Mathilde and never stolen by the Nazis. Nagy asserted that he was a good faith purchaser and that plaintiffs had failed to timely pursue their claim. Nagy relied upon the expert reports of Dr. Sophie Lillie,[FN20] Lynn Nicholas,[FN21] Laurie Stein [FN22] and Dr. August Reinisch [FN23]. He also submitted correspondence allegedly between Kornfeld and Mathilde regarding the 1956 sale of the Schiele Collection.
Supreme Court granted plaintiffs' motion for summary judgment (61 Misc 3d 319 [Sup Ct, NY County 2018]). The court concluded that the Artworks belonged to Grunbaum prior to World War II and that they were looted by the Nazis. Supreme Court found that plaintiffs had made "a threshold showing that they have an arguable claim of a superior right of possession to the Artworks, and that the Artworks are in the unauthorized possession of another who is acting to exclude plaintiffs' rights" (id. at 325). Accordingly, the court held that the burden of proof had shifted to defendants (id. at 325-326) and found that "[d]efendants have neither presented evidence nor raised a triable issue of fact to show that Mr. Grunbaum voluntarily transferred the subject artworks during his lifetime" and that "any evidence that Ms. [Mathilde] Lukacs possessed good title to the Artworks is absent from the record" (id. at 326).
Discussion
Replevin and Conversion
" A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession'" (William Doyle Galleries, Inc. v Stettner, 167 AD3d 501, 505 [1st Dept 2018], quoting Colavito v New York Organ Donor Network, Inc., 8 NY3d 43, 49-50 [2006]; see also Solomon R. Guggenheim Found. v Lubell, 153 AD2d 143 [1st Dept 1990], affd 77 NY2d 311 [1991]). "Two key elements of conversion are (1) plaintiff's possessory right or [*9]interest in the property; and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights" (Colavito, 8 NY3d at 50 [internal citations omitted]). Where a party's interests in property have been sold, there can be no interference with their property rights and a conversion claim may not be maintained (see Pappas v Tzolis, 20 NY3d 228, 234 [2012]).
To state a cause of action for replevin, a plaintiff must establish a superior possessory right to property in a defendant's possession (see Pivar v Graduate School of Figurative Art of N.Y. Academy of Art, 290 AD2d 212, 213 [1st Dept 2002]).
Here, we find that plaintiffs have made a prima facie showing of superior title to the Artworks based on evidence that establishes the following: (1) Grunbaum owned the Artworks prior to World War II; and (2) Grunbaum never voluntarily relinquished the Artworks. 1. Grunbaum owned the Artworks prior to World War II.
Defendants argue that plaintiffs submitted insufficient proof of Grunbaum's ownership of the Artworks. We disagree. While the specific works in question are not named in the inventories of Grunbaum's property or the prewar catalogs, there is sufficient proof of Grunbaum's ownership of the Artworks before World War II.
a. "Dead City III" is of Grunbaum provenance.
The 1956 catalog contained many Schieles, including "Dead City III," "Seated Woman With Bent Left Leg (Torso)" and the Artworks. However, Kornfeld only attributed "Dead City III" to Grunbaum. Mathilde is not included in the provenance listed for "Dead City III." Therefore, it is undisputed that at least one of the Schieles in the same collection as the Artworks originated from Grunbaum.
b. Federal courts concluded that "Seated Woman With Bent Left Leg (Torso)" has a Grunbaum provenance.
In Bakalar, the District Court found that another Schiele in the 1956 catalog, "Seated Woman With Bent Left Leg (Torso)," has a Grunbaum provenance. In reaching this conclusion, the court relied in part on Kornfeld's 2007 testimony where he admitted that all the Schiele works in the 1956 catalog were originally from the Grunbaum collection. A 2004 email from Galerie Kornfeld also confirmed that the provenance of all the Schieles featured in the 1956 catalog was Grunbaum.
Furthermore, defendants in their answer in this action admit that the Artworks share an established and documented historical provenance with "Seated Woman With Bent Left Leg (Torso)" and "Dead City III." However, defendants argue that all share the Lukacs-Kornfeld provenance, explicitly ignoring the conclusions made by the District Court in Bakalar, discussed supra.
Plaintiffs' expert Petropoulos also relies on both the District Court and the Second Circuit Bakalar decisions, concluding that this, paired with other relevant evidence, supports the finding that the Artworks were definitively of the Grunbaum collection. Petropoulos notes that defense expert Lillie agreed in her report and a 2005 article she wrote about "Dead City III" that the Schieles in the 1956 catalog all shared the same provenance.[FN24]
Petropoulos also opines that there is documentary evidence that the collection was transferred to an Aryan Trustee prior to 1940. He maintains that the gaps in the record do not suggest, as defendants' experts state, that the art was returned to the victims. This was never standard Nazi practice. Rather, it strongly suggests that former Nazis took and sold the Artworks in the thriving black market for stolen art in postwar Europe. He explained that this is the reason why the Grunbaum collection was kept largely intact during the war, as evidenced by the fact that Kornfeld sold approximately 80% of it in the mid-1950s.
Petropoulos states that there are a number of individuals who would have been capable of stealing the collection, including Kieslinger and Rochlitzer. Kieslinger was a known admirer of Schiele, and worked with Dr. Kajetan Muhlmann, a Nazi colonel, known as one of the most prolific art plunderers in history.
He adds that Otto Kallir purchased the works from Kornfeld in 1956 with the knowledge that they had belonged to Grunbaum. Otto Kallir and Grunbaum were friends before the war and there is evidence that Otto Kallir had inspected Grunbaum's Schiele collection in the late 1920s.
Finally, Petropoulos states that since the Bakalar ruling, new evidence has come to light that Kornfeld was found by German and Swiss governments to be an individual who trafficked in Nazi looted art. Kornfeld was the art dealer for Cornelius Gurlitt, purchasing 11 works in 1988 of what Kornfeld called "degenerate art." A raid on Gurlitt's home, known as "the 2012 Munich Artworks Discovery," revealed over one thousand pieces of art, with a value of over $1 billion, looted by the Nazis during the war. Gurlitt's father, Hildebrand Gurlitt, a dealer appointed by Joseph Goebbels and Hermann Goering to participate in the Nazi confiscation of Jewish-owned art, retained pieces for his "personal collection." Cornelius Gurlitt had agreed to cooperate with the German government but died shortly after the seizure. No one was ever prosecuted for the thefts.
c. Kornfeld explicitly acknowledged that the Artworks in the 1956 catalog share a Grunbaum provenance.
Kornfeld testified in his May 25, 2007 deposition in the Bakalar action that he acquired the Schieles in the 1956 catalog through Mathilde. He testified that he only knew of the Grunbaum provenance of these Schiele artworks because of the 1998 "Dead City III" proceeding [FN25]. He also stated that he did not know that the Artworks were originally Grunbaum's when he purchased them from Mathilde in 1956.
Plainly, Kornfeld's testimony that he did not know of the Grunbaum provenance of at least some of the Schieles in 1956 is false, as he listed "Dead City III" as originating from Grunbaum. Kornfeld testified that apart from his consultation of the 1930 catalog in creating the 1956 catalog, he had never heard of Grunbaum. However, there were three Schieles listed in the 1930 catalog attributed to Grunbaum's collection, while Kornfeld chose only to list one, "Dead City III," as explicitly attributed to Grunbaum in the 1956 catalog. He intentionally omitted Grunbaum's provenance as to the other two Schieles.
Moreover, prior to the 1998 seizure of "Dead City III," Kornfeld denied ever corresponding with [*10]Mathilde. However, after the seizure Kornfeld claimed that the Artworks had provenance through Mathilde. While Kornfeld testified in 2007 that he acquired the Schieles from Mathilde in 1956, her name does not appear in the 1956 catalog. Nor does Mathilde's name appear in Otto Kallir's 1966 update of his 1930 catalog as the provenance for the Schiele works. He includes Galerie Kornfeld and his own Gallery in the provenance. This update was made after Otto Kallir purchased the corresponding Schieles from Kornfeld. Additionally, Otto Kallir's granddaughter, Jane Kallir, also makes no mention of Mathilde in the provenance histories of her 1988 catalog of Schiele artworks.
Further proving that he knew of the provenance of the Artworks, Kornfeld admitted that in 2001 he had written to Dr. Leopold, who had amassed the Leopold Collection containing "Dead City III," stating that Mathilde had told him in the 1950's that the entire Schiele collection at issue had been held in storage at Schenker, but not sold during World War II, and was then retrieved by Mathilde after the war. He maintained that when he asked her of their origin, Mathilde allegedly told him they were "an old Viennese family possession" and he declined to inquire further.
The records purporting to show that Mathilde sold a total of 113 works of art to Kornfeld from 1952 through 1956 at best are inconclusive. Kornfeld acknowledged in his deposition that the records he produced had Mathilde's signature and name added in pencil, while the rest of the page was written in ink. He also admitted that her name was not added contemporaneously with the purchase. Kornfeld confirmed that Mathilde's signature on key documents was misspelled and her signature did not appear in her handwriting. Kornfeld surmised that the signature could have been her secretary's. Petropoulos states that Kornfeld refused to allow the original documents to be examined by a handwriting expert. We note that Kornfeld acquired three non-Schiele pieces as part of his acquisition of artworks in 1956. Grunbaum's 1939 property declaration specifically lists the three non-Schiele pieces acquired by Kornfeld [FN26]. Accordingly, it is clear that the Artworks here were obtained by Kornfeld from the same seller - whether or not that seller was Mathilde - as at least four other pieces that can conclusively be traced to Grunbaum's collection.
d. Additional evidence that the Artworks share a Grunbaum provenance. Jane Kallir explicitly attributes the provenance of the Artworks to Grunbaum in her deposition. She testified that in 1956, Otto Kallir, a friend of Kornfeld and a friend of Grunbaum with direct knowledge of his Schiele collection, having inspected and catalogued it in the 1920s, purchased the entire Schiele collection featured in the 1956 catalogue from Kornfeld. Jane Kallir had knowledge of the pieces as well, and she listed the Artworks by their current titles in her 1988 publication.
Furthermore, the Art Loss Registry lists "Girl [sic] in a [Black] Pinafore" as a Schiele [*11]from the Grunbaum collection, and Galerie Kornfeld confirmed via an email in 2004 stating that the provenance of the Artworks was Grunbaum.
Additionally, when Nagy reacquired "Woman Hiding Her Face," the Agreement listed the provenance of the work, as per Sotheby's, as being Fritz Grunbaum (until 1941), Elisabeth Grunbaum-Herzl (until 1942) and Mathilde Lukacs-Herzl.
e. Defense experts speculate that Mathilde had possession and title of the Artworks.
Defendants argue that plaintiffs did not "conclusively" prove that the Artworks belonged to Grunbaum. However, conclusive proof is not required to shift the burden to defendants. "A party moving for summary judgment must make a prima facie showing of entitlement to judgment as a matter of law, producing sufficient evidence to demonstrate the absence of any material issue of fact" (Giuffrida v Citibank Corp., 100 NY2d 72, 81 [2003]). "Once this showing has been made, the burden shifts to the nonmoving party to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact that require a trial for resolution" (id.).
Defendants' experts' speculations are unsupported by the evidence in the record and are insufficient to defeat summary judgment (Mitchell v Atlantic Paratrans of NYC, Inc., 57 AD3d 336, 337 [1st Dept 2008] ["The conclusory statements of . . . experts, unsupported by any probative evidence . . . are insufficient to defeat summary judgment"]; see also Bacani v Rosenberg, 74 AD3d 500, 503 [1st Dept 2010] ["An expert's affidavit containing bare conclusory assertions is insufficient to defeat summary judgment"], lv denied 15 NY3d 708 [2010]; Wright v New York City Hous. Auth., 208 AD2d 327, 331 [1st Dept 1995] ["It is well settled that an expert's affidavit which contains bare conclusory assertions is insufficient to defeat summary judgment. While an expert may, in his area of expertise, reach conclusions beyond the ken of the ordinary layman, he may only do so on the basis of the established facts. He may not himself create the facts upon which the conclusion is based"]).
Defendants argue that the Artworks belonged to Mathilde. However, they do not explain how Mathilde was able to acquire the Artworks either during the war or upon her return visits to Vienna after the war. Nor do defendants raise a triable issue of fact that Mathilde had valid title to the Artworks.
Elisabeth confirmed in her 1941 statement before an Austrian notary that there were no remaining assets in Grunbaum's estate after his murder. There were no records showing that Elisabeth had withdrawn the collection from Schenker [FN27] prior to Grunbaum's death to transfer it to Mathilde [FN28] or anyone else.
Furthermore, Mathilde left Austria in August 1938, months before the Schenker export permit was even filed, and was imprisoned in an internment camp herself for part of the war, [*12]making it improbable that she acquired the Artworks during the war. Defendants' expert Stein does not dispute that Mathilde did not remove the collection when she fled Austria. Stein states that records show that Elisabeth paid fees to Schenker at least until June 1939. Nor did the Artworks pass through the Allied Monuments, Fine Arts and Archives program, a program established in 1943 to aid in protecting cultural property in the war zones, indicating that they were no longer with Schenker after the war although they had been placed there during the war.
Lillie speculates that it is possible that Rochlitzer exported the collection at Elisabeth's direction. She argues that Rochlitzer was both a lawyer and composer, so he was "likely" acquainted with the Grunbaums prior to the war. Lillie adds that Rochlitzer himself was arrested by the Nazis three times on suspicion of aiding refugees in moving valuables abroad; therefore, he may have acted as an Aryan Trustee for the Grunbaums simply as a "ploy" to shield their assets from the Nazis. She opines that Rochlitzer's fee of 6,500 RM could have provided cover for the Grunbaums to dispose of the art collection to him so he could transfer them to Mathilde.
Lillie hypothesizes that the other "feasible" scenario is that Elisabeth gave the collection to a non-Jewish woman, Hassel, who appears to have helped other Viennese Jews during the war [FN29]. According to Lillie, the fact that so many of Schiele's works remained together indicates that the collection remained in the possession of a close family relative and that either Rochlitzer or Hassel provided a "possible" mode to transfer the entire collection to Mathilde.
Further, defense expert Stein posits that the Lukacses likely transferred the Artworks when they fled Austria, as there is evidence that they were able to move a great deal of their household assets through Schenker, including "11 oil paintings, 3 watercolors, 8 graphics, and 3 drawings." She admits such a transfer is unusual given that forced emigration was often used by the Nazis to seize property.
These opinions are speculative. First, the record establishes that Mathilde and her husband were detained and imprisoned by the Nazis in Brussels from October 26, 1943 until the end of the war. As it was standard Nazi practice to confiscate all property owned by Jews upon their imprisonment, it is improbable that Mathilde could have acquired Grunbaum's Schiele collection while imprisoned, as defendants' experts assert.[FN30]
Second, there is no evidence that Grunbaum and Rochlitzer were acquainted prior to the war. Additionally, Rochlitzer's fee was substantially greater than the listed value of the entire art collection. Also, the evidence in the record more closely reflects that Elisabeth paid his fee out of her own assets. There is no evidentiary basis for defendants' experts' speculations that Rochlitzer's appointment as Aryan Trustee was used by Grunbaum or Elisabeth as a ploy to transfer the art collection to Mathilde. Moreover, if Rochlitzer did somehow transfer the art collection to Mathilde at Elisabeth's behest, he would have had to do so during the war while Mathilde was imprisoned, because Rochlitzer was killed in an Allied air strike in 1945.
Third, while Hassel may have helped Jews transfer their possessions to loved ones, there [*13]is no evidence to support defendants' experts' speculations that Hassel helped Elisabeth transfer the art collection to Mathilde.
Finally, the entire art collection declared and exported by the Lukacses totals 400 RM and contained only 24 pieces. The Grunbaum collection which included 81 Schieles and many other works was valued at 5,791 RM. Further, Mathilde allegedly sold at least 110 pieces of art to Kornfeld after the war, substantially more than the 24 pieces exported by the Lukacses according to the record. We note that there are no records, including invoices, checks or receipts documenting that the Artworks were purchased by Kornfeld from Mathilde. Moreover, even if Mathilde had possession of Grunbaum's art collection, possession is not equivalent to legal title.
Accordingly, we find that plaintiffs have met their prima facie burden that the Artworks belonged to Grunbaum. 2. Grunbaum did not voluntarily relinquish the Artworks.
Under New York common law, a manual taking is not necessary to show that a wrongful exercise of dominion has occurred in order to claim conversion or replevin (see State v Seventh Regiment Fund, Inc., 98 NY2d 249, 260 [2002]). Accordingly, to whom Grunbaum lost the Artworks is immaterial. Supreme Court was not required to consider speculative theories of defendants' experts, in light of the undisputed facts that the art was inventoried, an Aryan Trustee was appointed to administer Grunbaum's art collection and Grunbaum was executed during the Holocaust.
First, the record establishes that the Nazis tracked Grunbaum's property through the Kieslinger inventories of Grunbaum's art collection signed by Otto Demus,[FN31] the head of the Nazi Federal Monuments Agency, and stamped as "completed." Plaintiffs' expert Petropoulos opines that this conclusively meant that at this point Grunbaum no longer had any control of his property. Defense expert Lillie concedes this point, stating that the Nazi policy was that all Jewish assets listed in any property declaration were usually effectively confiscated and available to the Reich after November 18, 1938.
Second, Rochlitzer's appointment as an Aryan Trustee for Grunbaum's property further establishes that Grunbaum no longer had any rights to his property, as only his Aryan Trustee could transfer Grunbaum's property at will.[FN32]
Third, it is undisputed that Schenker, the Nazi-controlled shipping company, took control of Grunbaum's property. There are no documents showing that the collection was exported from Schenker or that Rochlitzer's appointment was ever canceled. Accordingly, neither Grunbaum or Elisabeth ever reacquired possession or control of the Artworks.
Even accepting defendants' speculation that Elisabeth or Mathilde somehow managed to retrieve the Artworks, it was still misappropriated from, and lost to, Grunbaum and his legal heirs.
Defense experts posit that the power of attorney transferring the property from Grunbaum to Elisabeth was valid, or, alternatively, that the Artworks were given as an inter vivos gift by either Grunbaum or Elisabeth to Mathilde. Defense expert Lillie concedes that the Artworks once belonged to Grunbaum. However, she asserts that Elisabeth had the authority to transfer good title to Mathilde.
There is no evidence in the record that Elisabeth transferred title to the collection. Nor was Elisabeth able to convey good title as Grunbaum signed the purported power of attorney while imprisoned in Dachau. We reject the notion that a person who signs a power of attorney in a death camp can be said to have executed the document voluntarily (Bakalar, 819 F Supp 2d at 298 [the concurrence opines that "any transfer subsequent to Grunbaum's execution of the power of attorney at Dachau was void as a product of duress"]; id. at 300 [it was not established that "Grunbaum voluntarily relinquished possession of the Drawing, or that he did so intending to pass title"]; see also Philipp v Federal Republic of Germany, 248 F Supp 3d 59, 70 [D DC 2017], affd 894 F3d 406 [DC Cir 2018] [the sale of art during the Holocaust by a Jewish owner was coerced and under duress, covered by both HEAR and a violation of international law such to be an exception to the Foreign Sovereign Immunities Act]).
We find that plaintiffs have established that the power of attorney signed by Grunbaum while under Nazi control is a product of duress, and, therefore, any subsequent transfer of the Artworks did not convey legal title. "[A]rtwork stolen during World War II still belongs to the original owner, even if there have been several subsequent buyers and even if each of those buyers was completely unaware that she was buying stolen goods" (Bakalar v Vavra, 619 F3d 136, 141 [2d Cir 2010] [internal quotation marks omitted]). In New York, a thief cannot pass good title (see Lubell, 77 NY2d at 320; Federal Ins. Co. v Diamond Kamvakis & Co., 144 AD2d 42, 44, [1st Dept 1989], lv denied 74 NY2d 604 [1989]). Therefore, even assuming that Grunbaum transferred his collection to Elisabeth, the transfer was invalid. Accordingly, Mathilde could not pass good title to Kornfeld and/or Galerie Kornfeld.
Alternatively, defendants claim that Mathilde was gifted the Artworks by Grunbaum prior to his execution of the power of attorney, creating a valid inter vivos gift. To create an inter vivos gift, "there must exist the intent on the part of the donor to make a present transfer; delivery of the gift, either actual or constructive to the donee; and acceptance by the donee" (Gruen v Gruen, 68 NY2d 48, 53 [1986]). "[T]he proponent of a gift has the burden of proving each of these elements by clear and convincing evidence" (id.).
Here, the record is bereft of evidence that Grunbaum or even Elisabeth intended to gift the Artworks to Mathilde, let alone any evidence of delivery or acceptance. Since there is no evidence as to how Mathilde acquired the Artworks, defendants have not raised a triable issue of fact that Grunbaum voluntarily relinquished possession of the Artworks, or that he did so intending to pass title.
[*14] 3. Laches is not a bar to plaintiffs' claims to the Artworks.
Laches is "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party" (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801 [2003], 816, cert denied 540 US 1017 [2003]; Matter of Schultz v State of New York, 81 NY2d 336, 348 [1993]). The mere lapse of time, without a showing of prejudice, is insufficient to sustain a claim of laches (see Saratoga, 100 NY2d at 816; Macon v Arnlie Realty Co., 207 AD2d 268, 271 [1st Dept 1994]; Matter of Flamenbaum, 22 NY3d 962, 966 [2013] ["the essential element of laches [is] prejudice"] [internal quotation marks omitted]). Prejudice may be demonstrated "by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay" (Matter of Linker, 23 AD3d 186, 189 [1st Dept 2005] [internal quotation marks omitted]).
We reject defendants' argument that the defense of laches is a bar to plaintiffs' replevin and conversion claims (see B.N. Realty Assoc. v Lichtenstein, 21 AD3d 793, 799 [1st Dept 2005]). Nagy acquired both pieces in 2013. He suffered no change in position. Nor was any evidence lost between defendants' acquisition and plaintiffs' demand for the return of the Artworks. Significantly, Nagy was on notice of plaintiffs' claims to the Grunbaum collection prior to the purchase, as he filed a brief in the Bakalar action. Further, it is undisputed that Nagy purchased the Artworks at a substantial discount [FN33] from the price sought by Sotheby's prior to the claim being publicized, and he obtained insurance for the very purpose of insuring title against plaintiffs' claims.
The Bakalar court pointed to Mathilde's death as a prejudice. Mathilde, and other witnesses had died well before Nagy purchased the Artworks. In any event, as we already discussed, Mathilde could not have shown she had good title to the Artworks and her testimony would not have been probative (see Matter of Flamenbaum, 22 NY3d at 966 ["although the decedent's testimony may have shed light on how he came into possession of the [artwork], we can perceive of no scenario whereby the decedent could have shown that he held [good] title"]).
4. Plaintiffs are not entitled to attorneys' fees.
It is well settled in New York that attorneys' fees are considered an incident of litigation and are not recoverable unless authorized by statute, court rule, or written agreement of the parties (see Hooper Assoc. v AGS Computers, 74 NY2d 487, 491-492 [1989]; see also Madison Park Dev. Assoc. LLC v Febbraro, 159 AD3d 569 [1st Dept 2018]). An exception to that general rule exists when parties have "acted with disinterested malevolence [and have] . . . intentionally [sought] to inflict economic injury on [another party] by forcing [him or her] to engage legal counsel" (Brook Shopping Ctrs. v Bass, 107 AD2d 615, 615 [1st Dept 1985], appeal dismissed 65 NY2d 923 [1985]; see Palermo v Taccone, 79 AD3d 1616 [4th Dept 2010] [attorneys' fees denied in conversion even where the defendant locked up the plaintiff's equipment to intentionally prevent access]; Anniszkiewicz v Harrison, 291 AD2d 829, 830 [4th Dept 2002], lv denied 98 NY2d 611 [2002]).
Supreme Court granted attorneys' fees on a finding of "bad faith." However, more is required than bad faith. We find that Nagy did not act with "disinterested malevolence." Rather, he made a business calculation to purchase the Artworks knowing that title was cloudy yet [*15]believing that title could possibly be successfully defended.
Accordingly, we modify Supreme Court's decision to deny the motion as to attorneys' fees.
Conclusion We end by noting that in an effort to "ensure that laws governing claims to Nazi-confiscated art and other property further United States policy," and that "claims to artwork and other property stolen or misappropriated by the Nazis are not unfairly barred by statutes of limitations," Congress enacted the Holocaust Expropriated Recovery Act of 2016 (HEAR Act) (Pub L No 114-308, § 3 [2016]).
In promulgating the HEAR Act, Congress found that (1) the Nazis "confiscated or otherwise misappropriated hundreds of thousands of works of art" (HEAR Act, Sec. 2[1]) from Jews and others they persecuted, and that many works "were never reunited with their owners" (Sec. 2[2]); and (2) the Nazi victims and heirs have sought legal relief to recover artwork, but they "must painstakingly piece together their cases from a fragmentary historical record ravaged by persecution [and] war" (Sec. 2[6]).[FN34]
The tragic consequences of the Nazi occupation of Europe on the lives, liberty and property of the Jews continue to confront us today. We are informed by the intent and provisions of the HEAR Act which highlights the context in which plaintiffs, who lost their rightful property during World War II, bear the burden of proving superior title to specific property in an action under the traditional principles of New York law. We also note that New York has a strong public policy to ensure that the state does not become a haven for trafficking in stolen cultural property, or permitting thieves to obtain and pass along legal title (see e.g. Lubell, 77 NY2d at 320; Reif, 149 AD3d at 533). It is important to note that we are not making a declaration as a matter of law that plaintiffs established the estate's absolute title to the Artworks. Rather, we are adjudicating the parties' respective superior ownership and possessory interests. We find that plaintiffs have met their burden of proving superior title to the Artworks. Defendants raise no triable issue of fact.
Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered on or about June 11, 2018, which, inter alia, granted plaintiffs' motion for summary judgment on their claims of replevin and conversion and directing defendants to return the Artworks to plaintiffs, and for an award of damages, costs and attorneys' fees, should be modified, on the law, to deny the motion as to attorneys' fees, and otherwise unanimously affirmed, with costs.
All concur.
Order, Supreme Court, New York County (Charles E. Ramos, J.), entered on or about June 11, 2018, modified, on the law, to deny the motion as to attorneys' fees, and otherwise affirmed, with costs.
Opinion by Singh, J. All concur.
Sweeny, J.P., Richter, Tom, Kern, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 9, 2019
CLERK



Footnotes

Footnote 1: Grunbaum was also a doctor of the law and veteran of World War I. His jokes often targeted the Nazis. His fame in Vienna was such that there is a square named after him, "Fritz Grunbaum Platz."

Footnote 2:Kristallnacht, German for "crystal night" or "night of broken glass," occurred on November 9—10, 1938. During these days, Nazis attacked Jewish persons and destroyed their property. The name Kristallnacht refers to the litter of broken glass left in the streets after these organized riots took place (see https://www.britannica.com/event/Kristallnacht [last accessed June 10, 2019]). Quoting historians, plaintiffs' expert Petropolous notes that Kristallnacht "inaugurated the definitive phase of . . . the coerced expropriation of German-Jewish property . . . [even calling] for robbing the Jews of their apartments."

Footnote 3: The Nazis enacted a regulation on April 26, 1938, requiring Jews with holdings of more than 5,000 RM to declare all of their assets. Based upon that declaration, a Jew would then be subject to a tax, called an "expiation fine," in the amount of 20% of all assets. By The Ordinance on The Use of Jewish Property, enacted January 16, 1938, all property held by Jews, including art valued in excess of 1,000 RM was declared to be property of the Third Reich. Remaining property would be held by trustees, who permitted only the withdrawal of subsistence amounts. The Ordinance on the Seizure of Assets of Enemies of the People and the State in Austria, enacted November 18, 1938, legitimized the confiscation of all Jewish assets in favor of the Reich, and on July 11, 1939, it was declared that all Jews were to be stripped of their citizenship, and reiterated that all of their property was forfeited to the Third Reich.

Footnote 4: The US War Department confirmed Nazi control of Schenker in a letter dated October 19, 1945. 

Footnote 5: Schenker was a defendant in the Bakalar litigation (discussed infra). It claimed that its headquarters and warehouses were destroyed during the war, and thus it had no additional records.

Footnote 6: While these inventories, notices and requests are not in the record, these facts and conclusions are stated in the Resolution of the Michalek Commission of the Austrian Art Restitution Commission, dated November 18, 2010.

Footnote 7: An Aryan Trustee was "an administrator commissioned by" the Nazis for Jewish owned assets, as it was illegal for Jews to possess the property in their property declarations after November 8, 1938.

Footnote 8: In general, US Courts have found that "Nazi persecutory policy toward the Jews . . . had three main components: 1) all Jews first were confined in ghettos and issued new identification papers that identified them as Jews; 2) nearly all of these Jews later were forcibly removed from the ghetto for subsequent murder either by shooting or gassing; and 3) a limited number of Jews whom the Germans considered work capable' temporarily were spared and were transferred to forced labor camps where many died from starvation, disease and other inhumane conditions" (United States v Firishchak, 426 F Supp 2d 780, 785 [ND Ill 2005], affd 468 F3d 1015 [7th Cir 2006]).

Footnote 9: Vavra is a testamentary heir (by will) of Marta Bakalova, Zozuli's daughter, who died in 1996. Marta Bakalova was the heir to Zozuli, who died in 1977.

Footnote 10: Vavra lived behind the Iron Curtain until 1989 and there is testimony in the record that he was unable to effectively pursue heirship claims while behind it.

Footnote 11: A catalogue raisonné is a comprehensive, annotated listing of all known artworks by an artist.

Footnote 12: While the 1928 catalog explicitly attributes four Schiele works to Grunbaum, the 1930 catalog only includes three works.

Footnote 13: Defense expert Laurie A. Stein states that "[t]he paucity of detailed and illustrated published information about Schiele's works on paper (which had little monetary value at the time) hindered awareness of which objects specifically may have had provenance to Grunbaum. . . ." Further, Kornfeld testified at his deposition that he created his own titles as "[n]one of the leaves had any names and had to be written upon, described . . . . [Therefore, often there was] the same work by two different names . . . [and] title c[ould] change once you process[ed] the piece of art."

Footnote 14: A second Schiele "Portrait of Wally" was also on loan from the Leopold Foundation and exhibited at MOMA in late 1997. The heirs, different from those in this case, laid claim to it and the matter settled for $19 million while trial was pending.

Footnote 15: US Court of Appeals for the Second Circuit, Local Rule 32.1.1 (b) states that "Rulings by summary order do not have precedential effect."

Footnote 16: The Art Loss Register operates a database of pieces stolen or missing (http://www.artloss.com/en [last accessed June 11, 2019]).

Footnote 17: Prior to Thomas Gibson, the painting had passed through several owners.

Footnote 18: Petropoulos is a Professor of European History and Director of the California Center for the Study of the Holocaust, Genocide, and Human Rights, and former Research Director for Art and Cultural Property on the 2001 Presidential Commission on Holocaust Assets in the United States.

Footnote 19: Hofer is an Austrian attorney-at-law.

Footnote 20: Lillie is an independent scholar on Viennese Art prior to 1938.

Footnote 21: Nicholas is the author of several books on the looting of art by the Nazi regime.

Footnote 22: Stein is a curator and specialist in 19th-20th Century German Art.

Footnote 23:Reinisch is a professor of international law at the University of Vienna and has written on issues including Holocaust-related property restitution.

Footnote 24: In her rebuttal, Lillie explains that in 2005, she had found no evidence that Elisabeth gifted Mathilde the collection, that Kieslinger had looted the collection, or that the collection had been looted by other Nazis. Lillie still concludes though, by stating that the collection was in the possession of Mathilde and does not deny that it was originally Grunbaum's.

Footnote 25: He also stated that he had no personal knowledge concerning their provenance.

Footnote 26: Specifically, Kornfeld's ledgers reads that he acquired "Egger Lienz, 2 [S]oldiers in [B]lue [U]niforms," "a water color on cardboard 61x43" and "Kokoschka, 1 drawing, charcoal, female head," and "[Kokoschka], 1 drawing, pencil, female head." Grunbaum's property declaration from 1939 reads that he possessed "17. Egger-Lienz, 2 soldiers in front of mountain landscape, watercolour" and "40. 2 large Kokoschkas, female heads, hand drwg."

Footnote 27: Petropoulos notes that Elisabeth and Grunbaum were labeled "enemies of the state"; therefore it was illegal for Schenker to release the collection to them.

Footnote 28: Petropoulos adds that Thomas Buomberger, a researcher of the Grunbaum collection, states that, practically, Mathilde getting in touch with the Nazis over the collection would have meant her risking her life. Either way, she did not smuggle the art in a suitcase, as Dr. Leopold suggests, since the Artworks were still listed in Schenker and the property declarations after Mathilde had fled.

Footnote 29: Lillie bases this only on the existence of a letter by another Jewish woman to her daughter. While that letter mentions Hassel and Elisabeth by name, it only notes that this woman left items for her daughter with Hassel for her daughter to claim after the war.

Footnote 30: While defendants' experts do not explicitly state that Mathilde acquired the Artworks while imprisoned by the Nazis, they do contend that she acquired them during the war, which is the time she was imprisoned.

Footnote 31: The Nazi policy was that all Jewish assets listed in any property declaration were effectively confiscated and available to the Reich after November 18, 1938. Petropoulos adds that defendants' expert Lillie opined at one point that there was also no way for Jews to legally transfer property abroad after this date. In fact, Lillie opined that while this was not always synonymous with confiscation or seizure, assets listed in a property declaration were often plundered. However, she found that there was no evidence in the record that the Grunbaum collection was looted by the Nazis. She also stated that there was only automatic confiscation of property by the Nazis when Elisabeth was deported to Maly Trostinec.

Footnote 32: The Aryan Trustee Law of December 3, 1938, states that, "[u]pon the delivery of the order on the basis of which a trustee is appointed according to Paragraph 2, the owner of the business enterprise is deprived of his/her right to dispose of the assets which are administered by the appointed trustee." Petropoulos explains that this law rendered Jews legally powerless to transfer any property.

Footnote 33: Nagy did not submit an affidavit disputing plaintiffs' assertion that the Artworks were purchased at a substantial discount.

Footnote 34: Courts have generally interpreted the HEAR Act liberally, focusing on the purpose for which it was enacted (see e.g. Philipp, 248 F Supp 3d at 70 [the sale of art during the Holocaust by a Jewish owner was coerced and under duress, covered by both HEAR and a violation of international law such to be an exception to the Foreign Sovereign Immunities Act]; De Csepel v Republic of Hungary, 859 F3d 1094, 1110 [DC Cir 2017], cert denied US, 139 S Ct 784 [2019] [amendment to add HEAR claim permitted although state statute of limitations expired]).